26 C.C.P.A.(Patents)

## JENKINS PETROLEUM PROCESS CO. v. HERTHEL (two cases).[*]

### Patent Appeals Nos. 4003, 4004.

Court of Customs and Patent Appeals.
March 30, 1939.

Parkinson & Lane, of Chicago, Ill. (Wallace R. Lane and Frederick F. Mason, both of Chicago, Ill., Howard A. Hartman, of Milwaukee, Wis., and Frederick Schafer, of Washington, D. C., of counsel), for appellant.

Pennie, Davis, Marvin & Edmonds, of New York City (Raymond F. Adams, of New York City, Clarence M. Fisher, of Washington, D. C., and Louis D. Forward, of New York City, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

We have here appeals from decisions of the Board of Appeals of the United States Patent Office reversing decisions of the Examiner of Interferences in two in-

*Rehearing, and motion to strike, denied May 29, 1939.

terference proceedings, priority being awarded by the board to the junior party Herthel in both cases. The subject matter relates to oil cracking, the counts being process counts.

Both interferences were declared June 30, 1930, between an application of Jenkins, serial No. 723,144, filed June 30, 1924, and an application of Herthel, serial No. 167,-716, filed February 12, 1927. In interference No. 60,087 there was originally a third party who was eliminated by judgment rendered June 9, 1933. It is assumed that the necessity for two interferences grew out of the fact that the third party was involved as to only three of the counts.

The testimony covering both cases was consolidated in a single record along with that in a third case. Gray v. Jenkins, decided by us January 23, 1939, 101 F.2d 196, 26 C.C.P.A., Patents, ——. The record is quite voluminous and embraces a number of exhibits in addition to the oral testimony. While the subject matter of the two interferences is quite similar in character it will conduce to clearness to treat the cases separately. As hereafter will appear, the principal difference in the counts of the respective interferences resides in definitions of the elements used to present nuclei for the deposit of carbon during the cracking process. In that respect the counts of interference No. 60,087 are broader than those of No. 60,089. In the counts of the former the element is referred to as "a finely divided mineral substance," or as "a cracking agent * * * to present nuclei * * *." In the counts of the latter the element is limited to "fuller's earth."

It may be remarked that the reasons of appeal are substantially the same in each of the cases and in each they are quite numerous. During the progress of the proceedings in the Patent Office there were motions by Herthel to dissolve both interferences, one ground of such motions being that Jenkins had no right to make the counts because of lack of disclosure of certain elements in his application as originally filed, and, as will be seen, the decisions of the board were based largely upon its findings, contrary to that of the Examiner of Interferences, that this contention of lack of disclosure was well founded.

Our task of writing an opinion (or opinions) on review of the case is made complex, not alone by the issues involved but also by the manner in which the cases were dealt with by the respective tribunals of the Patent Office.

The Examiner of Interferences handed down his final decisions on the merits in both cases on the same day, December 21, 1935. His most elaborate discussion of both law and facts is contained in his decision in interference No. 60,087 which contains the broad counts. The Board of Appeals likewise rendered its decisions in both cases on the same day, May 4, 1937, but its principal opinion was written in interference No. 60,089, the counts of which are limited to fuller's earth.

As a consequence we necessarily are compelled to indulge in some repetition of numbers and of language in an effort to attain clarity.

Appeal No. 4003—Interference No. 60,087.

This interference involves three counts which read as follows:

"1. In an oil cracking process in which carbon-forming material is produced, the steps of charging into a body of oil subjected to cracking conditions additional oil and a finely divided mineral substance having a characteristic adsorptive action for carbon-forming material; dispersing said finely divided mineral substance in said body of oil; withdrawing from said body of oil during said process a portion of said oil and dispersed mineral substance; the amount of said finely divided mineral substance charged into said body of oil being so regulated as to permit of its intimate contact in suspension with said carbon-forming material.

"2. The process of converting a heavy petroleum oil into a light one which consists in circulating the heavy oil in a closed ring, continuously heating a portion of the ring, maintaining a pressure on the portion of the ring so heated, continuously taking off light vapors from the ring, continuously adding oil to the ring, continuously adding a cracking agent to said ring to present nuclei for the deposition of carbon, agitating the whole to maintain said nuclei in a state of suspension, and withdrawing residuum including part of said cracking agent with its deposited carbon.

"3. The process of converting a heavy petroleum oil into a light one which consists in circulating the heavy oil in a closed ring, continuously heating a portion of the ring, maintaining a pressure on the portion of the ring so heated, continuously taking off

light vapors from the ring, continuously adding oil to the ring, continuously adding a cracking agent to said ring to present nuclei for the deposition of carbon, agitating the whole to maintain said nuclei in a state of suspension, and continuously withdrawing residuum including part of said cracking agent with its deposited carbon."

It is thought that the process sufficiently appears from the counts and that no detailed analysis is here necessary.

Upon the basis of testimony cited and quite fully reviewed by him the Examiner of Interferences awarded the party Jenkins conception "as of the end of October 1923" and reduction to practice "no later than January 31, 1924." Since these respective dates were earlier than the respective dates (December 1, 1923 to January 20, 1924 for conception and February 5 to April 1, 1924 for reduction to practice) claimed by Herthel in his preliminary statement, priority was awarded Jenkins.

The principal opinion by the board was written in interference No. 60,089 but its discussion there was deemed by it fully applicable to the instant case and in both cases the reversals were based largely upon the same grounds; so we must go to that decision to determine what is meant in the decision of interference No. 60,087. While the board stated that the questions raised "are numerous and require very careful consideration, including a rather painstaking investigation of the records in the light of the arguments advanced by the parties," it confined its discussion largely to the question "whether the party Jenkins' application as filed discloses the invention," and held, in effect, that he failed to disclose in his application as filed a teaching of circulating the oil at such a speed that the mineral substance or cracking agent "will remain in intimate admixture during the circulation." It was further held by the board that, upon the record presented, Jenkins did not establish a circulation in his 1923 experiments which was more rapid than that disclosed in his application filed June 30, 1924; hence Jenkins was denied the date of October 1923 which had been awarded him for conception by the Examiner of Interferences. As we understand it, the effect of the board's decision was to deny Jenkins the benefit of his filing date for either conception or reduction to practice because of the board's opinion that the application failed to disclose or teach a sufficient speed of circulation. To Herthel it awarded conception in February 1924 with reduction to practice in the spring of 1924, and so the conclusion was reached that Herthel was entitled to the award of priority.

Obviously, the first matter challenging our attention is that of Jenkins' disclosure in his application as originally filed.

We find a discussion of this point by the Examiner of Interferences in a decision rendered on May 6, 1932, on Herthel's motion to dissolve in interference No. 60,089 where inter alia it was said:

"In finding that the counts are supported by the Jenkins application the examiner of interferences referred only to the original specification of the Jenkins application. The party Herthel contends that the Jenkins application does not disclose the step of 'maintaining the fuller's earth so introduced into the circulating oil in intimate admixture therewith during passage through the heating zone' as recited in count 1 and the equivalent element of count 2 for the reason that the Jenkins specification does not disclose the velocity required to maintain the intimate mixture required by the counts.

"The heating zone of the Jenkins apparatus is the bank of tubes 7 (Fig. 1) or as stated on page 8, line 16, 'the heating is applied, of course, to the tubes 7'. The party Herthel contends in effect that the passage of oil through the tubes 7 is at such a low velocity that the fuller's earth will settle in the tubes 7 and will not be kept in intimate admixture with the oil circulating in the tubes 7. It is obvious however that if the circulation of the oil in tubes 7 is so slow that if no heat were applied to the tubes the fuller's earth would settle it would be so slow that vaporization would occur in tubes 7 effecting such agitation of the oil therein as to maintain the intimate admixture of oil and fuller's earth. Furthermore the division of the oil stream into the multiple streams in tubes 7 could not help but increase the mixing of the fuller's earth and the oil. The examiner of interferences has no right to assume that Jenkins contemplates using such a great quantity of Fuller's earth as to defeat the object of the whole process disclosed. The Jenkins specification states on page 8, lines 30 to 34, 'In order that the deposit will not be formed into a hard material the oil is treated by an adsorbent which acts to maintain the carbon particles or the like in colloidal form whereby it may be carried away in suspended form or

the like with an excess amount of oil, to the vaporizing device.' This directly denies that the use of such a great amount of adsorbent as to prevent suspension thereof was contemplated by Jenkins. Furthermore the last paragraph on page 9 shows beyond a shadow of a doubt that Jenkins did not contemplate settling of the adsorbent in the still.

"It is not obvious, as apparently contended by Herthel that the only way the fuller's earth can be maintained in intimate admixture with the oil during its passage through the heating zone is by maintaining an abnormally high rate of circulation therein. The Herthel specification states that 'circulation is maintained by pump 21 at such velocity as to insure the mixture of the fuller's earth and oil and prevent settling while passing through the heating element.' * * * It is clear therefore that the 'intimate admixture' contemplated by Herthel in the heating element is merely such an admixture as will prevent settling. It is obvious therefore that intimate admixture may be attained by other means than by an abnormally high rate of circulation.

"After careful review of the decision, all of the arguments of Herthel and the Jenkins application, it is held that the Jenkins application in its condition as it was when it was filed in the Patent Office and before it was amended in any way clearly and adequately supported the subject matter of the counts. Any amendments made after the application was filed therefore are not essential to support the counts."

In his decision on the merits in interference No. 60,087, rendered December 21, 1935, the Examiner of Interferences made reference to a "powerful propeller" disclosed by Jenkins, and held, in effect, that the oil impelled by such propeller was forced through certain described tubes with "extreme rapidity."

The board's discussion (in interference No. 60,089) of this point was as follows:

"One of the questions before us is whether the party Jenkins' application as filed discloses the invention. The most important aspect of this question relates to the disclosure of the speed at which the oil is intended to circulate. At the top of page 2 of the Jenkins original specification it is stated: 'to provide for feeding the oil to and through the still continuously, preferably at a greater rate than the distilling thereof may occur.'

"At line 28 of page 4 it is stated: 'If desired, the sluice-way 3 may include a propellor 10 driven by a suitable shaft 11 extending upwardly through the drum 1 and operated by suitable operating mechanism whereby the propellor may mechanically create a circulation through the apparatus.'

"This matter has been amended by inserting 'rapidly' before 'circulation.'

"At line 6 on page 9 appears this statement: 'All of these ingredients, in the present invention, are caused to collect in the lower part of the drums and to be continuously drawn out * * *.'

"The reference to collection has been canceled by amendment and the following inserted: 'dispersed or distributed throughout the whole mass or contents in the still and are caused.'

"We believe that the above excerpts are fairly representative of the disclosure of the Jenkins application as filed with respect to the circulation, and it is our opinion that there is no teaching in the application as filed of circulating the oil at such a speed that the fuller's earth will remain in intimate admixture during the circulation.

"It is the examiner's view that, since a propellor is shown, this would necessarily cause a circulation of the required nature. It is to be noted, however, that the party Jenkins in his application as filed indicated that the use of the propellor was optional. (See the above excerpt from page 4.) We believe that there is no reason to assume that the propeller would be driven at a speed sufficient to cause a circulation high enough to produce the improvement over the art. This is particularly true because, as pointed out in the excerpt from page 9, the original specification indicates that collection will occur in the lower portions of the drums.

"Taking up now the party Jenkins' conception in the fall of 1923, prior, of course, to the filing of his application on June 30, 1924, we are convinced, after studying the record, that he has not established a circulation at that time which was more rapid than that disclosed in his application. It is our opinion, therefore, that the party Jenkins has not proven a conception in that year."

It will be observed from the foregoing excerpts from the decisions of the tribunals of the Patent Office that both referred to fuller's earth as the adsorbent material.

This grew out of the fact that the counts involved in interference No. 60,089 were limited to that material. In interference No. 60,087, now being considered, the counts are broad enough to include other adsorbent materials, and the Jenkins' specification names various ones, among them calcium oxide or lime. In a reply brief for Jenkins filed before us, it is said: "* * * The Board did not make any finding as to Jenkins' use of lime or other mineral adsorbents as called for in Interference No. 60,087. Even if the circulation in the Jenkins still had been deficient with reference to fuller's earth, it does not follow that the character of the circulation was such as to be incapable of keeping lime in suspension."

It should be understood, however, that Jenkins makes no concession of deficiency with respect to fuller's earth. It was specifically named in the list of materials stated in his application as filed.

It is evident from the decision of the board that it regarded as critical the "speed" of circulating the oil. In other words, the view of the board, if we correctly interpret its decision, is that a rapid circulation of the oil into which the adsorptive material is injected is essential in order to assure the retention of such material in intimate admixture with the oil.

It may be that in practical operation rapid circulation is required to obtain best results, but the counts under discussion do not, by any express language, require it. There is nothing in them which defines maintaining the adsorptive material in intimate admixture in the oil as being dependent upon circulation of any kind, rapid or otherwise. Count 1 merely calls for dispersing the finely divided mineral substance in the body of the oil, the amount of such substance to be so regulated as to permit of its intimate contact in suspension with the carbon forming material. The meaning of counts 2 and 3 upon this phase, as we interpret the language used, is that maintenance of the materials in suspension (and possibly their dispersion) is accomplished by agitation of the whole—that is by "agitating" the combined oil and adsorptive material.

The Examiner of Interferences in his decision of May 6, 1932, excerpts from which are quoted above, took due note of this situation and pointed out that "intimate admixture may be attained by other means than by an abnormally high rate of circulation."

As has been indicated, the Examiner of Interferences in his decision rendered in interference No. 60,087, December 21, 1935, made a comprehensive review of all the pertinent testimony relating to Jenkins' alleged conception in October 1923 and his alleged reduction to practice in January 1924. Numerous parts of the evidence of Jenkins and of his corroborating witnesses were quoted literally.

Inasmuch as the board's decision in this particular interference was based solely upon its theory respecting speed of circulation, it gave (so far as its decision indicates) no particular attention to the evidence so quoted and reviewed by the Examiner of Interferences.

Since we find ourselves out of harmony with the board's theory, we have examined the evidence in the light of the arguments made in the briefs and orally.

To repeat that evidence here could serve no purpose of consequence.

It is our conclusion that the findings of the Examiner of Interferences as to both conception and reduction to practice of the counts of this interference by Jenkins are correct.

Under such findings Jenkins is entitled to the award of priority.

So, the decision of the board in this interference is reversed.

Appeal No. 4004—Interference No. 60,089.

The counts read:

"1. In the cracking of heavy hydrocarbon oils for the production of lighter hydrocarbon oils therefrom by distillation under pressure, the improvement comprising circulating a stream of the oil from a bulk supply through a heating zone and back to the bulk supply, heating the oil to a cracking temperature in the heating zone, introducing finely divided fuller's earth into the oil circulating from the bulk supply to the heating zone at a point between the bulk supply and the heating zone, and maintaining the fuller's earth so introduced into the circulating oil in intimate admixture therewith during passage through the heating zone.

"2. In the cracking of heavy hydrocarbon oils for the production of lighter hydrocarbon oils therefrom by distillation under pressure, the improvement comprising circulating a stream of the oil from a bulk supply through a heating zone and back to the bulk supply heating the oil therein to a cracking temperature in the heating

zone, supplying fresh oil to the oil circulating from the bulk supply to the heating zone at a point between the bulk supply and the heating zone, introducing finely divided fuller's earth in admixture with fresh oil so supplied to oil circulating from the bulk supply to the heating zone, and maintaining the fuller's earth so supplied in intimate admixture with the oil while passing through the heating zone."

With respect to the foregoing counts the Examiner of Interferences said: "The counts in this interference differ mainly from those of interference 60,087 in being specific to the use of fuller's earth. The counts of interference 60,087 in respect to mineral agent are generic. Count 1 herein refers to a pressure cracking process for oil in which oil is circulated from a bulk supply to a zone where it is heated to a cracking temperature and back again to the bulk supply. At a point between the bulk supply and the heating zone it is required that fuller's earth be introduced and also that it be kept in admixture with the oil in the passage through the heating zone. Count 2 differs from count 1 only in specifying the admission of fresh oil in admixture with the fuller's earth at the same point as count 1 specifies for the latter."

The Examiner of Interferences then directed attention to the testimony which had been recited and reviewed in his decision in interference No. 60,087 and held that Jenkins was entitled to a date for conception "no later than the end of October 1923." He held, however, that the testimony in Jenkins' behalf did not show that he actually used fuller's earth in any of the experiments shown to have been made by him or under his direction prior to his filing date, and hence held that he was restricted to such filing date (June 30, 1924,) for reduction to practice.

The evidence on behalf of Herthel was then reviewed. No date for conception was awarded Herthel, but it was held that "For reduction to practice Herthel is considered not to establish any date earlier than his filing date, February 12, 1927," and further that "Herthel so far as his proofs show, neither conceived the invention of the counts nor reduced it to practice prior to Jenkins and he therefore cannot prevail."

The purport of the board's holding, although seemingly stated with some hesitancy, is that Herthel is entitled to an award of conception and reduction to practice "in the early part of the year 1924."

It will be borne in mind that the board's decision in this case rests in part upon the same basis as that in interference No. 60,-087, supra; viz., failure of Jenkins to show use in his experiments, or disclosure in his application, of a circulation of the mixture of fuller's earth and oil sufficiently rapid to maintain the fuller's earth in intimate admixture with the oil during the passage through the heating zone. For the reasons stated in our decision in that case, we are not in harmony with the board upon that question. It is true that the counts in this case do not specify agitating the mixture, as do counts 2 and 3 of that interference, but the Jenkins specification is quite definite as to that matter and the counts here are regarded by us as having the same status in that respect as count 1 of that case. Hence we hold that here, as there, Jenkins is entitled to his filing date of June 30, 1924, for reduction to practice, but no earlier date can be awarded him. Indeed he claims none, nor does he claim diligence. It is said in a reply brief filed on his behalf by permission of the court, "We are not contending that Jenkins reduced to practice in actual operation with fuller's earth."

It follows, therefore, that if the date awarded Herthel for reduction to practice was correct he is entitled to prevail as to the counts of this interference.

Much of the argument concerning this point is quite technical in character. It was the view of the Examiner of Interferences that Herthel failed to show a practice of the feature expressed in the clause of count 1 reading "introducing finely divided fuller's earth into the oil circulating from the bulk supply to the heating zone at a point between the bulk supply and the heating zone," and expressed in count 2 substantially the same with the additional limitation prescribing an admixture of the fuller's earth with fresh oil.

It appears that the apparatus through which the Herthel experiments were carried on was constructed early in 1924 and operated from March 5, 1924, to June 15, 1924. The Examiner of Interferences described these as "experimental runs" but held that they were not in accordance with the counts because not conforming to the limitation above recited.

In its discussion of the Herthel record the board first made reference (evidently

while considering the question of conception) to a letter of Herthel written in January 1924, pointed out that this letter did not definitely refer to "introducing finely divided fuller's earth into the oil circulating from the bulk supply to the heating zone at a point between the bulk supply and the heating zone," and commented as follows—"we do not see how it would be possible to draw off the earth and tar from a low point in the digestion or bulk supply chamber and then circulate fuller's earth with the oil without at least introducing the fuller's earth into the oil at a point beyond where the separation occurs. It is true that this introduction might be in the upper part of the bulk supply. However, in Herthel's Exhibit 3, bearing date of February, 1924, and the testimony relating to this exhibit, it was shown that the fuller's earth was added on the top of the bulk supply. The party Jenkins argues that the introduction of the fuller's earth at this point in the Herthel Exhibit 3 is not introducing the earth 'at a point between the bulk supply and the heating zone.'

"We cannot agree with this view. Herthel, we consider, has established the rapid circulation of the oil from the top of the bulk supply and we think that the earth would at once be carried away to the heater rather than mingle with the bulk supply. We believe that practically he introduced the fuller's earth between the bulk supply and the heating zone. The counts do not specify that the introduction is outside the container for the bulk supply."

As to reduction to practice the board then said: "Coming now to the party Herthel's reduction to practice, we believe that the record shows that during the spring of 1924, experiments were carried on with the form of still shown in his Exhibit 3 and that, prior to the party Jenkins' filing date, Herthel had become convinced that the process defined by the counts of this interference was a successful one."

Another statement of the Examiner of Interferences was that "no run on a full size still was ever carried out by Herthel * * and consequently the invention was never actually reduced to practice."

Of this the board said: "The Examiner of Interferences held, in effect, that because these operations were experimental rather than commercial, a reduction to practice had not been proven. There are many decisions relating to reduction to practice in which a commercial operation was not carried on and many times it has been held, both by this Board and by the Courts, that a commercial operation is not necessary for a reduction to practice. Of course, each case must stand upon its own merits, and we realize that the delay in filing the application by the party Herthel perhaps creates some suspicion as to the tests made in the spring of 1924. Taking everything into consideration, however, we feel justified in holding that Herthel reduced to practice at this time."

Extensive argument is presented before us relative to the board's holding. It is insisted on behalf of the party Jenkins that the activities by, or for, Herthel between March and June 1924 were nothing more than abandoned experiments and did not constitute a reduction to practice. Technical arguments are based upon descriptions of certain features of the respective devices, and the construction of the counts.

To these arguments we have given respectful and thorough consideration, but we find nothing therein which, in our opinion, justifies our holding that the board erred in its conclusion on this phase of the controversy.

■ We have not overlooked the fact that upon Herthel, as the junior party, there rested the burden of showing, by a preponderance of the evidence, the facts essential to establish his priority. This we think he did.

■ For the reasons indicated, the board's award of priority to the party Herthel upon the two counts of this interference is affirmed.